**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

**ULMER L. ("U. L.") PALMER**                                          **PLAINTIFF**

**VERSUS**                                        **CIVIL ACTION NO. 2:10cv73KS-MTP**

**LIBERTY MUTUAL INSURANCE COMPANY**                          **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the court on a Motion for Partial Summary Judgment **[#116]** filed on behalf of the plaintiff, Ulmer L. Palmer and on a Motion for Summary Judgment or in the Alternative for Partial Summary Judgment filed on behalf of defendant Liberty Mutual Insurance Company **[#122]**.  The court, having reviewed the motions, the responses, the pleadings and exhibits on file and being otherwise fully advised in the premises finds that the motions are not well taken and should be denied.  The court specifically finds as follows:

## FACTUAL BACKGROUND

This is an action for punitive and other extra-contractual damages arising out of the alleged bad faith denial or delay in payment of worker's compensation benefits to the plaintiff, Ulmer L. Palmer ("Palmer"), a Mississippi citizen.  Palmer's employer, former defendant G.B. Boots Smith Corporation ("Smith"), is a Mississippi resident corporation.  Defendant Liberty Mutual Insurance Company ("Liberty Mutual") is a non-resident of Mississippi.

On September 20, 2005, Palmer suffered multiple injuries when he was thrown from a man-lift that he was attempting to load onto a trailer in the course and scope of his employment with Smith.  Smith had procured a valid policy of worker's compensation insurance from Liberty Mutual that was in effect at the time of Palmer's accident.  Palmer's injury was timely reported to his employer and to Liberty Mutual, who adjusted and managed the claim.  Approximately six months after the work accident, on March 3, 2006, Liberty Mutual filed an Employer's Notice of Controversion due to its alleged inability to obtain medical records from one of Palmer's treating physicians, a Dr. Schwartz.  Palmer also filed a Petition to Controvert on May 17, 2006.  The workers' compensation claim was ultimately compromised and settled in January 2010.

Thereafter, on February 11,  2010, Palmer initiated the present action in the Circuit Court for the Second Judicial District of Jones County, Mississippi.  The gravamen of Palmer's state court complaint was that Liberty Mutual and Smith failed to pay disability benefits due him under the Mississippi Workers' Compensation Act in a timely manner.  Palmer asserted claims for bad faith and breach of fiduciary duty generally against both defendants.  Liberty Mutual removed the case and Palmer moved to remand twice.  The court denied both motions to remand and dismissed Smith.  The case proceeded through discovery and is now before the court on the present motions.

Palmer asserts that through a detailed analysis of the law and facts, he is entitled to partial summary judgment on all issues of liability against Liberty Mutual and that this matter should then proceed exclusively on the issues of compensatory and punitive

damages.  Liberty Mutual contends that Palmer has not pled a claim – and, indeed, has

no claim – for any alleged delay in receiving medical treatment.  Rather, Liberty Mutual

argues that the claims in this action revolve entirely around a generic allegation that

Liberty Mutual failed "to timely pay or reimburse to the Plaintiff very large medical

expenses, very large travel expenses for medical care and some temporary disability

payments."  Thus, under the reasoning of Liberty Mutual, Palmer's bad faith claims

cannot survive summary judgment.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment

where "the pleadings, the discovery and disclosure materials on file, and any affidavits,

show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law."  FRCP 56(c); and *see Celotex Corporation v.*

*Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).  The existence of a

material question of fact is itself a question of law that the district court is bound to

consider before granting summary judgment.  *John v. State of La. (Bd. of T. for State C.*

*& U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the

evidence and determine the truth of the matter, but to determine whether there is a

genuine issue for trial.  There is no issue for trial unless there is sufficient evidence

favoring the non-moving party for a jury to return a verdict for that party.  If the evidence

is merely colorable, or is not significantly probative, summary judgment is appropriate.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

3

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Id.* "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Company v. OKC Corporation*, 812 F.2d 265, 272 (5th Cir. 1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial. *See Celotex*, 477 U.S. at 323, 106 S.Ct at 2552." *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992). In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion. *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. *Topalian*, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." *John*, 757 F.2d at 708. "Summary judgment

4

cannot be supported solely on the ground that [plaintiff] failed to respond to defendants'
motion for summary judgment," even in light of a Local Rule of the court mandating
such for failure to respond to an opposed motion. *Id.* at 709.

However, once a properly supported motion for summary judgment is presented,
the nonmoving party must rebut with "significant probative" evidence. *Ferguson v.
National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978). In other words, "the
nonmoving litigant is required to bring forward 'significant probative evidence'
demonstrating the existence of a triable issue of fact." *In Re Municipal Bond Reporting
Antitrust Lit.* , 672 F.2d 436, 440 (5th Cir. 1982). To defend against a proper summary
judgment motion, one may not rely on mere denial of material facts nor on unsworn
allegations in the pleadings or arguments and assertions in briefs or legal memoranda.
The nonmoving party's response, by affidavit or otherwise, must set forth specific facts
showing that there is a genuine issue for trial. Rule 56(e), Fed.R.Civ.P. *See also,
Union Planters Nat. Leasing v. Woods*, 687 F.2d at 119.

While generally "'[t]he burden to discover a genuine issue of fact is not on [the]
court,' (*Topalian* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents
merely filed and those singled out by counsel for special attention-the court must
consider both before granting a summary judgment.'" *John*, 757 F.2d at 712 (quoting
*Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

## ANALYSIS AND DISCUSSION

Palmer argues that the foundation for the relief sought herein can be summarized
by taking four groups of deposition excerpts (three from the Defendant's sole expert;

5

one from the Defendant's claims adjuster) and placing them side by side. According to Palmer, these excerpts should be read in the context of Palmer's contention that certain critical portions of his workers' compensation claim were denied for an extended period of time and then illegitimately delayed thereafter.  Palmer contends that Liberty Mutual, through its hired expert, is now manufacturing reasons for certain delays, despite such rationales never being a part of the claims file or the claim's adjuster's mental processes expressed in her deposition.

Liberty Mutual argues that although Palmer takes issue with a handful of claims, over the course of the approximate four years following the accident, Liberty Mutual paid $147,479.00 to more than thirty different medical providers on Palmer's behalf without dispute.  These amounts do not include the lump sum payment of Palmer's disability claim following the ALJ's March 25, 2008 order or the ultimate settlement of the medical portion of Palmer's claim.

Bad faith cases are usually factually intense., thus the court will recount the facts as asserted by the parties in some detail.  The evidence in this case indicates that Palmer was injured in a work-place accident on September 20, 2005, when the man-lift he was operating malfunctioned and threw him approximately forty feet.  Palmer landed on his left side but  was not knocked unconscious.  He got up and walked about thirty yards to his truck, then drove himself approximately one-half to three-quarters of a mile to a friend's house to call an ambulance.  The ambulance took him to Oktibbeha County Hospital where Dr. James Thriffley, the emergency room doctor, ordered a battery of tests, which indicated Palmer had suffered a "right transverse process at L2 and L3," a "comminuted fracture of the distal radius," and a possible rotator cuff tear.  Dr. Thriffley

operated on Palmer's left wrist and discharged him the next day.  Palmer returned to work on October 3, 2005.

Palmer's employer, Smith, timely filed a "Workers Compensation – First Report of Injury or Illness" with the Mississippi Worker's Compensation Commission ("MWCC") and notified Liberty Mutual of the accident via facsimile on October 5, 2005.  The next day, on October 6, 2005, Liberty Mutual contacted both Palmer and Smith, the employer, to discuss the accident.  Although he apparently had seen several doctors after the accident, Palmer allegedly indicated to Liberty Mutual that he had only seen the "emergency room doctor" (Dr. Thriffley) and Dr. Weaver (to whom Dr. Thriffley referred him), and was scheduled to see an eye doctor.  Palmer allegedly denied seeing any other doctor during this contact with Liberty Mutual.  He indicated that his only injuries were a broken left wrist, broken eye sockets, two broken vertebra, and bruising to his left shoulder, the left side of his face and his gallbladder. He denied any other injuries and confirmed (as his employer had indicated) that he had returned to work.

Liberty Mutual accepted the accident as compensable and on October 7, 2005, the day after speaking with Palmer and his employer. Tiffany Derichsweiler (now Tiffany Kister), the Liberty Mutual adjuster assigned to the file, established an action plan, including determining what type of ongoing treatment was necessary, verifying that Palmer's employer was sending all medical bills to Liberty Mutual for payment, and setting reserves.

Liberty Mutual began adjusting the claim and, among other things: assigned a nurse to attend one of Palmer's medical appointments to gain an understanding of his treatment and help Palmer understand Liberty Mutual's role, assigned a nurse to help

obtain medical information, assisted in setting up appointments, consulted with an in-house doctor to understand Palmer's treatment, and began to timely pay Palmer's medical bills upon their receipt.

As stated above, approximately six months after the work accident, on March 3, 2006, Liberty Mutual filed an Employer's Notice of Controversion due to its alleged inability to obtain medical records and information from Dr. Schwartz who allegedly was also treating Palmer.  The Notice of Controversion specifically stated that Dr. Thriffley's treatment – for which evidence had been timely and properly submitted to Liberty Mutual, unlike Dr. Schwartz's treatment – was causally related and that his claims were not being denied.  Apparently, Liberty Mutual continued to pay medical bills it received from other providers, both before and after filing the Employer's Notice of Controversion, that properly submitted their claims.

On September 26, 2005, Dr. Wesley Girod (a Hattiesburg surgeon) began treating Palmer for his multiple organ trauma, ultimately adding diagnoses of a left facial fracture, possibly fractured ribs causing chest pain and shortness of breath, complete occlusion of the right ICA and 50% stenosis of the left subclavian artery.  Dr. Girod performed a right femoral-popliteal bypass in March, 2007.

Subsequent to his initial wrist surgery and return home, Dr. Michael Weaver (of the Hattiesburg Clinic) took over treatment of Palmer's left wrist.  Dr. Weaver performed the surgical removal of the pins in Palmer's wrist on October 31, 2005.  Upon referral from Dr. Weaver for confusion and memory problems, Dr. Ronald Schwartz (of the Hattiesburg Clinic) started seeing Palmer on November 7, 2005, Dr. Schwartz allegedly diagnosed Palmer with post-concussive syndrome and related his frontal executive

8

difficulties to the closed head trauma of the work injury.  According to Palmer, an MRI brain scan read on November 22, 2005, showed ischemic changes involving the right occipital cortex and left posterior parietal cortex, abnormal flow in the right carotid, and minor scattered border zone changes in the right MCA-ACA distribution.  An MRI intracranial and extracranial study performed on December 21, 2005, showed an occluded right internal carotid artery and 50% stenosis of the left external carotid artery. Dr. Schwartz added diagnoses of a right occipital injury, left posterior parietal injury, right carotid occlusion, and C5/C6/C7 radiculopathy, in addition to other diagnoses by prior doctors, and stated that Palmer's vascular occlusion problems were most likely related to his head trauma.  On March 9, 2006, Dr. Schwartz gave the opinion that Palmer would not be able to pursue gainful employment at that time.

The records from the March 9, 2006 visit, however, were allegedly not provided to Liberty Mutual, and Dr. Schwartz continued in his refusal to respond to inquiries relating to the causal connection of his treatment to the work accident, according to Liberty Mutual.  As such, disability payments were not started on March 9, 2006.  The following month, however, on April 27, 2006, Palmer underwent a carpal tunnel release surgery by Dr. Thriffley.  Liberty Mutual began temporary total disability benefit payments as of April 27, 2006, and continued them until Dr. Thriffley released Palmer to return to work.

On April 17, 2006, Dr. Christopher Cooley (of the Hattiesburg Clinic) evaluated Palmer's vision at Dr. Schwartz's request and diagnosed him with visual field defect, moderate nonproliferative diabetic neuropathy, and senile cataracts, and later added diagnoses of status post closed head injury with possible either traumatic optic

9

neuropathy or changes in visual field due to occipital lobe damage, and stated that his problems were not due to cataracts.  On May 16, 2006, Dr. Andrew Dickson, neuropsychologist from the Hattiesburg Clinic, evaluated Palmer at Dr. Schwartz's request. He diagnosed Palmer with agitated depression, impairment of complex attention, and borderline working memory, said that the current result were not predictive of a return to work, and suggested that Palmer apply for disability.  Dr. Schwartz continued to treat Mr. Palmer for depression, visual impairment and inattention problems.

Palmer filed a Petition to Controvert on May 17, 2006.  The action then proceeded through the MWCC with both parties filing motions.  Palmer underwent an independent medical exam ("IME"), the results of which indicated that a number of the conditions Palmer were being treated for were not related to the work accident.  On March 25, 2008, the Administrative Law Judge determined that Palmer was permanently totally disabled from March 9, 2006 forward.  Liberty argues that, notably, Palmer had never argued he was permanently totally disabled.  Nevertheless, as a result of the ruling, Liberty Mutual paid a lump sum totaling $130,299.02 and the parties thereafter settled the medical portion of Palmer's claim for an additional $77,364.00.

The Mississippi Workers' Compensation Law provides that workers' compensation benefits are the exclusive remedy available to an employee that is injured in the course of his employment.  Miss. Code Ann. §71-3-9.  However ,the Mississippi Supreme Court recognized the viability of a bad faith claim against a workers' compensation carrier for intentional torts in *Southern Farm Bureau Casualty Ins. Co. v. Holland*, 469 So. 2d 55 (Miss. 1984).  The Court stated:

10

We hold that the majority view permitting action for an independent tort against an insurance carrier in workers' compensation cases is in line with the thrust of our recent decisions recognizing that punitive damages are appropriate where an insurance company intentionally and in bad faith refuses payment of a legitimate claim in order to prevent insurer from enforcing inadequate settlement.  (Internal citations omitted).

469 So.2d at 58.  Of course, one alleging such an action must allege and prove the

recognized elements of such a claim in order to be entitled to punitive damages.

The law is well settled that the insured has the burden of establishing a claim for bad faith denial of an insurance claim.  The insured must show that the insurer denied the claim [or unreasonably delayed it] (1) without an arguable or legitimate basis, either in fact or law, and (2) with malice or gross negligence and disregard of the insured's rights.  The insurer need only show that it had reasonable justifications, either in fact or in law, to deny payment.  Moreover, whether an insurer had an arguable reason to deny an insurance claim is an issue of law for the court.

In deciding whether an insurer had an arguable basis to deny insurance liability, Mississippi courts apply the directed verdict test: Unless the insurer would be entitled to a directed verdict on the underlying insurance claim, an arguable reason to deny an insurance claim exists in most cases.

*U.S. Fidelity and Guaranty Co. v. Wigginton*, 964 F.2d 487, 492 (5th Cir. 1992).  *See*

*also  McLendon v. Wal-Mart Stores, Inc.*, 521 F. Supp.2d 561, 565 (S.D. Miss. 2007);

*Life & Cas. Ins. Co. v. Bristow*, 529 So. 2d , 620, 622 (Miss. 1988); §11-1-65 (1)(a).

In this case, Palmer alleges that Liberty Mutual, in bad faith, denied or delayed

payment of benefits under a workers' compensation policy of insurance, and that "[s]aid

bad faith and breach of fiduciary duty was attended by an intentional wrong, insult,

abuse or gross negligence, all with total callous disregard for the Plaintiff's rights, which

amounts to an independent tort of bad faith."

An insurer need only show that it had "reasonable justifications, either in fact or in

law," to deny or delay benefits.  *Richards v. Amerisure Ins. Co.*, 935 F. Supp. 863, 867 (S.D. Miss. 1996).  "[T]he fact that an insurer's decision to deny benefits may ultimately turn out to be incorrect does not in and of itself warrant an award of punitive damages if the decision was reached in good faith."  *Liberty Mutual Ins. Co. v. McKneely*, 862 So. 2d 530, 533 (Miss. 2004).  In other words, "even when an insurance carrier denies or delays payment of a valid claim, when based on a reasonable cause, bad faith will not lie and no predicate exists for a punitive damages claim.*"  Tarver v. Colonial Life & Accident Ins. Co.*, 2007 WL 551766, at *9 (S.D. Miss. Feb. 21, 2007) (citation omitted). Whether there was an arguable reason to deny or delay a claim is an issue of law for the court.  *Blue Cross & Blue Shield of Miss. v. Campbell*, 466 So. 2d 833, 842 (Miss. 1985) (*on pet. for reh'g*).

The first category of claims are those that were delayed in payment.  Liberty Mutual argues that it is axiomatic that, in order for an insurer to delay or deny a claim in bad faith, it must first have a claim.  Liberty Mutual asserts that when a simple comparison is made between the date the allegedly delayed claims were actually received by Liberty Mutual and the date they were paid, it is apparent that there was no delay relating to these bills.  Liberty Mutual points out that in his discovery responses, Palmer calculates the various alleged delays from the date the service was rendered, not the date a claim was actually made.  According to Liberty Mutual, the various medical providers, however, did not submit claims on the date of service.

The actual dates the claims in this category were submitted are hotly disputed. The court cannot make a legitimate determination as to the correctness of Liberty Mutual's argument in this regard.  However, if the proof at trial shows that the requests

12

for payment were not timely submitted, Liberty Mutual's liability in a bad faith context is

seriously diminished.  Simply put, if the claims were paid within a reasonable time of

their submission, regardless of the date of service, there can be no bad faith liability.

However, the evidence at trial will have to flesh out when these claims were incurred,

submitted and paid.

The second category of allegedly bad faith claims relates to allegedly improperly

submitted ones.  As to this group, Liberty Mutual asserts that they are not "valid and

enforceable" or payable as a matter of Mississippi law.  Mississippi Code §71-3-15 sets

out a number of conditions that must be met to render a claim for medical services

rendered payable.  Section 71-3-15(1) states, in part:

> [N]o claim for medical or surgical treatment shall be valid and enforceable,
> as against such employer, unless within the twenty (20) days following the
> first treatment the physician or provider giving such treatment shall furnish
> to the employer, if self-insured, or its carrier, a preliminary report of such
> injury and treatment, on a form or in a format approved by the
> commission. Subsequent reports of such injury and treatment must be
> submitted at least every thirty (30) days thereafter until such time as a final
> report shall have been made.

Miss. Code §71-3-15(1).  Subsection 3 of the statute further makes clear that:

> No medical bill shall be paid to any doctor until all forms and reports
> required by the commission have been filed.

Miss. Code §71-3-15(3).  The language used in the statute is mandatory.  *See e.g., City*

*of Jackson v. Rebuild Am., Inc.*, 2011 Miss. App. LEXIS 195, *17-18 (Miss. Ct. App.

April 5, 2011) (citing *McFadden v. State*, 580 So.2d 1210, 1215 (Miss. 1991))("The use

of words such as 'shall' and 'will' in a statute or regulation are considered mandatory in

nature.").  Thus, according to Liberty Mutual, the requisite forms and documentation

required by the Commission must be submitted and no claim is to be paid until they are

provided.

Moreover, §71-3-15(3) provides the MWCC with the authority to establish a fee schedule to further govern the payment of claims for medical services.  In accordance with that section, the MWCC adopted the "Official Mississippi Workers' Compensation Medical Fee Schedule" ("Fee Schedule") which provides further detailed requirements for medical claims.

The Fee Schedule defines a "properly submitted bill" to only include "a request by a provider for payment of health care services submitted to a payer on the appropriate forms with appropriate documentation and within the time frame established under the guidelines of the medical fee schedule.  MCCR, I. Gen. Prov., C. Definitions, ¶ 43.  To this end, the Fee Schedule provides:

> Billing for provider services shall be submitted on the forms approved by the Commission. Providers must bill outpatient services on the CMS-1500 (formerly HCFA-1500) form or forms B-9 and B-27 for professional services, regardless of the sight of service. Health care facilities must bill on the UB-92 form. *Id.* (MCCR, I. Gen. Prov., B. Payment, ¶ 4).

> The attending physician must file the CMS-1500 form and appropriate documentation within 20 days of rendering services on a newly diagnosed work-related injury or illness. Subsequent billings must be submitted every 30 days with the appropriate medical records to substantiate the medical necessity for continued services. Late billings will be subject to discounts, not to exceed ten percent (10%) for each 30-day period or fraction thereof beyond 60 days. *Id.* (MCCR, III. Reimbursement, A. Instructions to Providers, ¶ 4).

> All requests for payment of services rendered to the injured/ill worker must be accompanied by the supporting documentation." *Id.* (General Guidelines, IV. Copies of Records and Reports, ¶ C).

> The required documentation should reflect the patient's current medical status, response to treatment, and recommended plan of care. Required documentation includes . . ." *Id.* (General Guidelines, IV. Copies of Records and Reports, ¶ E).

14

The Fee Schedule reiterates the limitations placed on a carrier by the statute. Namely, the Fee Schedule provides that "an employer/payer shall not make a payment for a service unless all required review activities pertaining to that services are completed."  MCCR, III. Reimbursement, B. Instructions to Payers, ¶ 2.  Liberty Murual asserts that, obviously, until all the required documentation has been provided, a carrier – like Liberty – cannot conduct all the required "review activities."

Liberty Mutual and Palmer have itemized the claims that were not paid or were delayed as improperly submitted.  Liberty Mutual now contends that since this category of claims were not submitted on the proper forms with the proper reports, they were not "valid [or] enforceable."  As such, Liberty Mutual argues there was clearly a legitimate or arguable reason for delaying their payment.  Indeed, Liberty Mutual asserts there was no right to payment and, thus, no "right" Liberty violated.  Further, Liberty Mutual argues it was statutorily instructed not to pay the claims meaning it did not commit some willful or malicious wrong, it was simply following the law and, thus, did not act in bad faith.

Like the first category of delayed payments, the court is not so sure Liberty Mutual is correct.  Nor is the court convinced Palmer has the upper hand in the argument.  There appears to be a monumental conflict in the factual assertions about when, or if, the claims were properly submitted on the proper forms in conformity with the statute.  That being said, the court is simply not in the position, at this time, to grant summary judgment one way or the other on these claims.

The third group of claims are ones which were delayed because Liberty Mutual contends there was no information that related the treatment and/or injury to the work accident.  Liberty Mutual admits that these claims were delayed until documentation

15

was submitted linking the treatment/injury to the compensable work accident or there was an adjudication that they were related.

It is true that the burden of proof in a worker's compensation claim rests on the claimant.  The claimant must prove three things by a fair preponderance of the evidence: (1) an accidental injury; (2) arising out of and in the course of employment; and, (3) a causal connection between the injury and the death or claimed disability. *Guy v. B.C. Rogers Processors, Inc.*, 16 So.3d 29, 32-33 (Miss. Ct. App., 2009) (citing *Hedge v. Leggett & Platt*, 641 So. 2d 9, 13 (Miss. 1994).  The burden of proof only shifts away from the claimant once the claimant has made out this prima facia case.  *Guy*, 16 So. 3d at 33.  In "all cases in which the causal connection would not be obvious to the untrained layman, the claimant must prove the causal connection between the alleged injury and the alleged disability by competent medical proof."  *Sonford Products Corp. v. Freels*, 495 So. 2d 468, 471 (Miss. 1986); *see also Cole v. Superior Coach Corp.*, 106 So. 2d 71, 72 (Miss. 1958) (medical causation must be established by expert testimony "in all but the simple and routine cases").

It is a bit disingenuous for Liberty Mutual to imply that it should be equated to that of a "layman."  Indeed, Liberty Mutual is in the business of evaluating medical claims on a daily basis.  It has at its disposal nurses and doctors who routinely review medical claims submitted.  It also has the advantage of requesting an IME when needed, and did so in this case.

Palmer contends that some of the claims denied or delayed by Liberty Mutual were unquestionably related to his work injury.  There are numerous factual disputes regarding whether some of these claims were properly denied or delayed.  Such factual

16

disputes defeats any request for summary judgment by either party.

The final category of claims are ones labeled by Liberty Mutual as "miscellaneous."  Included in this group are bills for surgery on Palmer's wrist to remove the pins which Liberty Mutual contends was "non-emergency" and was required to be pre-certified.  The denial or delay in payment of this claim in the face of the evidence and the law is too factually intensive to allow summary judgment.  The same is true of the balance of these claims related to amounts paid directly by Palmer and the alleged benefits due for temporary total disability.  The court cannot rule as a matter of law that the denial or delay in paying these claims was not bad faith.  Thus, based on the record presently before the court, summary judgment for either party is not warranted.

IT IS THEREFORE ORDERED AND ADJUDGED that Motion for Partial Summary Judgment **[#116]** filed on behalf of the plaintiff, Ulmer L. Palmer and the Motion for Summary Judgment or in the Alternative for Partial Summary Judgment filed on behalf of defendant Liberty Mutual Insurance Company **[#122]** are both denied.

SO ORDERED AND ADJUDGED this the 13th day of July, 2011.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE